Well, there are two, three, two people here that say David Kraybill. Attorneys, please step forward. Everybody may be seated. Please identify yourself. Doug Johnson on behalf of the appellant, David Kraybill. Good morning, Your Honor. Claire Wesley-Connelly on behalf of the people of the State of Illinois. Thank you. You'll have to regular about 20 minutes, 25 minutes. That would be fine, Your Honor. Fifteen minutes. Fifteen minutes would be fine, thank you. May it please the Court, Counsel. As I stated, my name is Doug Johnson and I represent the defendant, appellant David Kraybill. Mr. Kraybill was convicted of murder initially, and his case was reversed by this court on appeal. And he went to a second jury trial a few years ago, and he was once again convicted. I'd like to address my comments initially to the fourth argument raised in our brief, which involved the trial court's decision to grant the State's motion in limine to bar the conversation between David Kraybill and Detective Christensen in 2004. This conversation took place a year after the murder, and it's very clear that the victim was murdered. And in 2003, shortly after the victim was found, Detective Christensen and David Kraybill interacted on several occasions. Initially, there was a search warrant executed a few days after the victim was found murdered at David Kraybill's house, was where the search warrant was executed. Mr. Kraybill was arrested for obstruction of justice, not murder, because of his behavior when the search warrant was executed. Detective Christensen went to the jail and spoke with David Kraybill. Detective Christensen then spoke to David Kraybill several more times over the next 24 to 48 hours. Detective Christensen then spoke to David Kraybill when Mr. Kraybill bonded out a few days later. So there were several interactions. And at trial, several of the statements that Christensen attributed to Kraybill were admitted. It is our position that through the common law doctrine of completeness and through Rule 106, these statements were not hearsay, and they should have been admitted. What happened in 2004 to explain what happened in 2003, to explain Mr. Kraybill's statement. How does the statement in 2004 explain what Detective Christensen or Sergeant Christensen attributed to Mr. Kraybill in 2004? Because it wasn't a situation where Christensen said something like, hey, Dave, before we talked to you, you said you didn't have anything to do with it. And now you're telling us you did or anything like that. What that conversation, and we have the transcript appended to our, is in the record. What that conversation was all about was Christensen saying. Which conversation are you referring to? Well, they're both the same. But 2004, Christensen comes in and says, Dave, before you told me this, Dave, before you told me this, Dave, when we talked, he might as well be saying, Dave, explain what you said. Dave, shed light on what you said. He's not saying, what happened last week? But Mr. Kraybill is arguing not that it's Detective Christensen's statements that are important to be before the jury, but his own statements, his own I never said that statement. But it isn't I never said that. He's arguing his own statements. He's saying, and I'll read them to the ones we take that should have been admitted. Just by means of setting it up, I'll tell you the things that Christensen said, such as on C-153, this is how it starts out. We talked about some of those things a year ago. And if you want, I can go over those things again. C-176, listen to me. I'm going to go through. These are my own notes. And then we get to C-176, 177. This is Christensen. These are the things you told me. You even said that you and I both know that sometime I'm going to have to face charges in Illinois. And you told me this too, that your attorney is soon going to be attempting to work something out, some kind of deal with the Illinois DA. You told me that too. And this is what we take issue with. David Crabill says, oh, I might have said that. That might have been referring to some gun charges. So what the jury heard was, well, this guy's a whack job. And he obviously had something to do with this. His attorney, he knows he did it. That's why he knows he's going to face charges. But what Crabill is doing is he's shedding light. He's explaining in this conversation that he didn't know was being recorded. And he's saying that might have been referring to gun charges, something the jury had no reason to consider. And it's going right back to the prior conversation and explaining it. It seems to be the precise situation where the doctrines of completeness in Rule 106 would permit this to be admitted. Two more statements he made. He said, Christensen says, Dave, you also told me, well, the perpetrator might have taken a gun to the scene just for his own protection. Devastating testimony against David Crabill. Because the jury is sitting there thinking, wait a minute, now he's obviously given a little bit of what happened here for whatever reason. But if you look at the context in 2004, David says with regard to that, I was giving you theories. We were talking about theories, like I'm a cop or something. So the context was not Dave, tell me what you did. It was according to David. And he didn't know he was being recorded. I was giving theories. I was trying to help you out. And the final statement I'll bring up, Christensen from the stand said, well, David told me in 2003, I'll give you a piece of the pie. I'm not ready to give you the whole pie. I'll give you a piece of the pie. I'm not ready to take that leap of faith and spend the rest of my time in jail. And Christensen in 2004 confronts David with that statement, which was to the jury, that's all they heard about it. But what David says to that is, I never said that. I may have said some of that. For example, David says, well, now see, some of those contain a brief remedy of truth in it. Like when I said, yeah, I'll give you a piece of the pie. Obviously, I was trying to help you guys out as much as possible. But it's funny that you guys add like a word or two in there. So he's not just denying this happened. He's saying, let me interpret it. Let me explain it to you. Let me shed light. And that is why I believe the doctrines are perfectly tailored to allow this type of conversation. And obviously, Rule 106 is even more applicable because it allows, is more clear that it allows conversations that take place at a separate time. Your position in your brief is that the entirety of the 2004 interview should have come in, including his assertions that the police were framing him and that this was all a setup. Both in the first trial and in this trial, we ran up against a brick wall in that the only way this was going to get in was if Mr. Craybill took the stand. And therefore, there didn't get to be a point where we could talk about, well, maybe you'd have to be, and Your Honor's point is very well taken,  but certainly the points I'm taking or the parts I've highlighted should have come in when Christensen is saying, explain to me what you meant by this. You said this to me. And it's clear what he's doing. And out of fairness, the jury should have heard what David Craybill had to say about those things because I do believe it places it in context. And the state is arguing, well, this merely contradicts like in Cragin, or Cragin, however that's pronounced. And they're saying this is like that case, but it isn't like that case. In that case, what happened is the defendant initially talked to the police and said, I didn't have anything to do with it. And then subsequently, the defendant talked to the police and said, okay, I had something to do with it. I know what happened. I was there, but I'm not guilty. Kind of I imagine or do believe that's kind of a common thing. He made some inculpatory statements the second time after not saying anything inculpatory the first time. And the defendant there wanted to put in his first statement because he wanted to show or suggest to the finder of fact, this will show that I was abused. Basically, that was his point. They will look at what happened here and see, I didn't say anything initially, and then I said something. So I should be able to put in that I didn't say anything initially, because that will show something must have happened to me to make the inculpatory statements. And that's not something the Doctrine of Completeness, Common Law, or Rule 106 would allow. That's just saying, well, trying to raise an inference that he was abused or beat up by the police officers. Here, we are talking again about David Craybill explaining Shedding Light and telling what he meant when he said certain things to Detective Christensen. But that goes to those three points you made, not the entirety of his statement. Not the entirety of his statement, Your Honor. And in those portions, out of fairness, it would have been appropriate for the jury to hear that, and they could have disregarded it. They could have again thought, this guy's crazy. He did it. Or they might have thought, wait a minute, there's more going on here than we thought. And I was barred, we were barred from questioning Christensen on the standard playing it in our case in chief. With time, I'd like to make a couple quick comments on two other arguments. One is the silencer. A silencer was introduced into evidence. It was found in David Craybill's house. It was clearly connected to David Craybill. He had it. Our point was, this is supremely prejudicial. This is, in fact, illegal in Illinois. This is an Illinois jury. The silencer is illegal. He owned it in Wisconsin. It's legal up there. But a more sinister device, I believe, an average juror could almost not think of. I think an inference many people would have is, if you own a silencer, there's only one thing you can do with it, and that's kill someone without someone knowing. The question is whether the weapon or the silencer is something that could have been used in this crime. There was evidence that it could have been used in this crime because of the neighborhood and neighbors not hearing anything. Well, that, I believe, is incredible speculation upon speculation. First of all, and I wish I had the page number of the record, but I can represent to the court that the state conceded this was an isolated or somewhat isolated area. That's from the state. And so then we have to think, in this isolated or somewhat isolated area, this silencer is connected because, well, if he didn't use a silencer, then someone would have heard the gunshots and they would have called 911, and there was no 911 call. I submit to you that at this time of night, or when all we know is night, we cannot think it's even more likely than not that someone is going to, oh, I heard what could be firecrackers, what could be a car backfiring. I think to just figure that, oh, well, I think I just heard somebody killing somebody, so I'm going to call 911, I think that's a real stretch, especially when we consider the prejudicial nature of this device. Yes, if a weapon is suitable, we don't have to guarantee it's the murder weapon, but if it's suitable, then it should be admitted. And that's what happened with the Beretta in this case. They didn't find the murder weapon, but they saw David Cray belonged to Beretta, six manufacturers could make this gun. Therefore, yes, we are not arguing that the Beretta could not be introduced, or the fact that he did own a Beretta. But the silencer fit the Beretta. The silencer fit the Beretta, but there wasn't testimony or evidence that said, well, and it won't, this is a real complex thing, like, I mean, we have a real intricate kind of process we go through when we make a silencer fit a Beretta. And I will also add that the expert for the state admitted there could have been a test done. It could have been a test to find out whether or not this fire, and it wasn't done. Well, was there anything that stopped the defense from doing that test on the silencer? I think that's a very good question. I will say that the state. We're not talking about the bullet test. We're talking about the test. The expert testified that it would be possible if a silencer were used at close range to see whether there were any human residue on the silencer. Yes, he did test on it. And there was no such test done by the state to show that the silencer was used. My question is, why didn't the defense do it then? Under constraints, part of it is the inability to compensate an expert for that kind of test. I believe the burden to hire one, I think it's the expert, the state has the expert. The state is running all these tests, and they choose to not do certain things. The defense doesn't have the same luxury. I understand your point, but it's not the same situation. Didn't the state's expert, Mr. Lucky, say, in order to know whether this particular silencer was used in this crime, I would need the actual murder weapon? He said that on direct examination, I believe, Judge. But on cross, he said when the test was explained to him, a test you could do, he said, yes, that would be possible. It would not necessarily tell you if the gun was used, but it might. There was a test to fire any gun through the silencer and look at the bullets, and then fire the gun without using the silencer and see if there was any difference in what was left. That could have been done, and it may or may not be conclusive. And so admitting the silencer was, again, because of its prejudicial nature and the speculation involved in whether or not it was possibly used in the crime. I believe the state argued it's not unreasonable to figure that it was used in the crime. But if you're going to enter something like that or admit that before the jury, I think there should be more evidence to tie it to show that it is suitable. And then finally, the second argument, which is tied to the first in our brief, involves the admission of the coins taken from David Craybill's house. David Craybill, when the search warrant was executed, David Craybill, many things were taken from his house, including some coins. They just took pictures of the coins. Pictures, I'm sorry, pictures of the coins were taken. And the detective said, I just took pictures of them. I didn't think they had any evidentiary value. And then at trial, I was barred from arguing that Joel Catarellas was a burglar. There's no dispute he was a burglar, but the court ruled that there was not a significant enough tie, and that's written in our brief. But what happened was interesting. I could not argue that the victim was a burglar and had hundreds of thousands of dollars. They brought in the coins. The picture of the coins was brought in. They brought a picture of the coins in, and there was evidence that there was something going on with regard to burglary, because secreted in the car owned by the victim was a stolen ring. The jury didn't know it was stolen. A gold pendant and some coins. And so we filed a motion to say, don't allow these coins in. And this will tie David Craybill to whatever the jury is thinking about. Let me ask a question to get to the heart of it. Assuming you are correct, without looking at the other arguments you make, just on this one argument, would that be enough, and why would it, to reverse? Because. Where's the prejudice? The state doesn't have to show motive. We all agree on that. But a big lack, I don't want to say element, a lacking thing. It wasn't an element. The motive is not an element. But something lacking was, why would David Craybill kill his lifelong friend? The state doesn't have to prove it, but it just didn't make any sense. And when these coins came in, why was it so prejudicial? When the state was allowed to argue, these coins, the defendant makes a big deal about the coins and the things found in the car. We're not saying these coins, he collects coins. We're not saying these are his. It tied David Craybill to the coins in the car that the jury, I believe, would infer were stolen, and it showed, I believe, the jury would infer, there you go, these two were burglars together. That's why it happened. There you go, these two, and it happened in the rebuttal closing argument. That question we had about why in the world would this guy kill his lifetime friend has to do with that stuff hidden under the mat that we've kind of been thinking about. He, those coins, I believe the argument made once the coins got in was, defendant collects coins, these, we're not saying these are his. That means they're stolen coins. He collects coins. I think the inference there is that he's part of the burglary, he's part of this guy who did get in, the catcher, we did get some in, barred from most of it, but did get the fact that the victim. You made the argument. Well, I didn't get to argue much. The deceased. But through the victim's mother's prior testimony got in that, yes, the deceased acquired things, lived a pretty good lifestyle and acquired things. So there were a lot, the coins shouldn't have been admitted, the silencer should not have been admitted, and the 2004 statement should have been admitted. And I think a lot of the things that were true, the jury didn't hear the truth. They didn't hear that recording. They didn't hear that the victim was a burglar and the defendant was not. And therefore, in this case that the appellate court, Your Honors, previously called the evidence not overwhelming, and I think the evidence was the same in trial one and trial two, that was enough to cause error and that case should be remanded. Thank you. Thank you. May it please the Court, Counsel. The trial court's decisions in this case regarding the admission of evidence was proper. There was no abuse of the trial court's discretion in its decisions regarding the admissibility of any of the evidence in this case. I'm going to go sort of in reverse order as far as defense counsel's arguments. As far as the coins that were admitted, the coins that, there were coins, and I'm going to try to backtrack here a little bit and explain some things. There were coins that were found in the floorboard on the passenger side of the victim's car along with some other items, some rings, a pendant. The coins that were found, they were never shown to have been stolen. So there's an allegation that they were stolen. There's never been any proof that those coins were stolen. No one ever claimed them. We presented that during the direct of the police officer. During cross-examination, counsel extensively asked him questions regarding the details about these coins that were found. We never argued anything about any coins during opening statements and during our closing remarks. Now, we sought to introduce coins that were also found. They were unique collector coins. And he was a collector of coins, wasn't he? I don't know if he was a collector of coins. Do you have a document found that showed that he was keeping track of the coins he had? I don't. To be honest with you, I don't recall that there was any testimony. I do recall that the photograph showed that these coins were in sets and they took photographs. So what was admitted was a photograph of some coins that were found during the execution of the search warrant. So what does that have anything to do with the murder? Well, I think they do because I think what happens is when you find these same type of collector coins on the passenger side. What do you mean by same type? Where was the testimony that they were the same type? They're collector coins. Well, there are lots of people who collect coins. Correct. That's a coincidence. But it's a unique set of items. It's not like you found a pencil in the car and you found a pencil in the defendant's house. A lot of people collect coins. Correct. People have coins in their pockets all the time. Correct. So what happens if you have coins? I still don't see the connection. But it connects the defendant with the victim and the crime scene. No, it doesn't. The fact that he had coins. So he has a ring. He had a ring. They found a ring in the car. Are you saying it's the same thing? It's a unique ring. They found a ring in the car. Does that mean that that's connected? No, because they didn't find a ring in the defendant's house that was similar to it. No, my hypothetical is they found a ring in his house. You would make the same argument, wouldn't you? Well, I would. Is it because they found a ring? He had a ring? There must be a connection. I think based on the fact that these are coins and they are a unique item. What's unique about coins? People collect coins. I don't understand this uniqueness. Because it's one of those things where it's not normal to find coins in a car and you find the same kind of car. You see the same type of coins. What do you mean by same type of coins? It keeps coming back the same type. I guess I make my distinction between collector coins, which is not something that everybody has, as opposed to United States currency that's easily transferable among people. But a lot of people collect coins. Correct. So there's no testimony that the way they were kept was similar, that there was similarity between the coins under the car that's mapped in the picture of the coins. There's nothing like that. No, because I will admit that the coins that were on the passenger side of the car, and I will note that the trial court noted that it was found on the passenger side of the car in which the shooter stood over the victim and started shooting at him, and the victim's fingerprint was found on the passenger side of this car. It's all connection. It shows the defendant's presence there. No, it doesn't. The fact that coins are in his home? I don't understand that. You're missing something on the connection. Well, I just think it's one of those things where, and again, based on the uniqueness of this evidence, this was admissible to show that there's a connection. We have to show that this is relevant evidence. That's what we have to show. We don't have to show that this is the smoking gun out there that shows that this is the defendant. Nobody says smoking gun, but I don't see where the relevance is because people have coins and there was no connection between the coins other than the fact that they're collector coins. A lot of people have collector coins. I bet it could be thousands of people could have been connected with this crime. Is that what you're saying? Well, but I'm not saying that because we introduced this, that this is the utmost evidence that's going to establish the defendant's guilt in this case. Well, my question is whether the fact that if we find that the picture should not have been admitted, whether that's a basis to reverse. Oh, absolutely. There's no basis to reverse, and I'd like to clarify some comments that were made by defense counsel regarding the arguments that were made in this case regarding the coins. We never mentioned the coins during opening statement. We never mentioned the coins during closing arguments. The only time that we ever mentioned the coins was in rebuttal argument, and during rebuttal it was only in response to defense counsel's suggestion, is that, oh, perhaps the killer left these coins here. And we wanted to make sure that the jury understood that the coins that were left in the car was not the smoking gun that was out there that showed that perhaps someone else had committed this crime. So that's the only reason. And when we did so, we made sure that the jury understood that we were not relying upon these for some great evidential value that this is the link that showed the defendant was the killer. So if you look at our comments in those contexts in which it was made, you will see that there's absolutely no prejudice to the defendant in this case. And even if you were to find that there was error in the admission of these coins, the defendant was not prejudiced by the admission of them. You've connected the coins to the one fingerprint in the car. His friend that he's had for life presumably has been in his friend's car more than once. Correct. So who knows when that fingerprint was left there? Well, we don't know when the fingerprint was left there. Yeah, but the fact that this was in the winter and the fingerprint was on the outside of the car, not on the inside of the car. So the amount of time that that fingerprint could be there was less by the fact that it was on the outside of the car as opposed to the inside of the car because it was exposed to the elements. We still don't know when it was put there. We don't know when it was put there. But you've said that because the fingerprint was there and because the coins were there it proves and the victim was shot from the shooter standing over the victim, which I don't see how he could have done that from inside the car on the passenger's side. I'm not getting that. If he was inside the car on the passenger's side, then he wasn't standing over the. . . Well, I apologize if I said standing over. He was. . . Counsel, you were the one who connected the coins to the fingerprint, and I'm just agreeing with my colleague that I'm not seeing how random coins, even if they're collector coins, are connected without some testimony to this defendant's collection or the kind of collection that he has. He had an inventory of his collection, right? I don't recall that there was any. . . I thought he had an inventory of his collection. There was any inventory of his collection. But it was a mere photograph that they introduced. These were loose coins. Pardon? These were loose coins. On the floorboard, correct. On the floorboard. These were all in plastic encasements. Correct. Correct. Correct. Correct. So I don't run out of time. I'd like to address also the omission of the silencer in this case. The trial court absolutely did not abuse its discretion in allowing the prosecution to introduce this .22 caliber silencer that was found in the defendant's home during the execution of the search warrant because we established a connection between the silencer and the crime that was used. There's no question that a weapon was used in this case. The defendant's bullet-ridden body showed that he was shot several times with a .22 caliber weapon. There were also other .22 caliber bullets found at the scene. There were .22 caliber cartridge cases throughout the scene by the victim's body and inside the victim's car. There was also substantial evidence that the defendant, we believe, participated in this crime. And the only conflict here is whether or not there was testimony that the silencer that was used was suitable for the commission of the crime. And we believe and we submit that there was sufficient evidence showing that the silencer that was used was suitable for the commission of the crime. What do you mean the silencer was used? You just said the silencer that was used. We don't know if a silencer was used. And we don't have to show that a silencer was used. We have to show that this weapon was suitable for the commission of the crime. And the expert that we called said that because this silencer was threaded to fit the .22, that the defendant purchased at the same time as the .22, that it could have been used in the crime. And that's sufficient. That's what we have to show that the suitability of this weapon was used. We don't have to show conclusively that it was used. And, in fact, the defendant stipulated to the fact that he had purchased the .22 and that the silencer that was purchased at the same time that he purchased the .22 was threaded to fit the .22 caliber Beretta that was found. And the suitability is the fact that nobody heard the shots or nobody reported the shots. Well, that's one link. That's one link. That's an argument that we can make. That's a reasonable inference from the evidence that's presented in this case. Now, it's an isolated area, granted, where the defendant took the victim in this case and where the shooting occurred. But there are still homes in that area. And considering the number of shots that were fired in this case, I think it's a reasonable inference that a silencer was used so that no one would hear the shooting when it occurred. I'll ask the same question I asked the defense. Why didn't the state run the human residue test on the silencer if it was at close range? Well, I think the expert, Mr. Lucky, explained to that why he didn't because he said if he had the actual gun that was used in the shooting. No, that was talking about the bullet case, the bullet markings. I'm talking about the silencer itself. He testified that there were tests that could be done on the silencer itself to show whether or not it had been used to shoot someone at close range, presumably some human residue at the end of the silencer. That test wasn't done. It wasn't done by the defense. It wasn't done by the state. It would have been conclusive that this silencer was used in this crime. I think the expert, what he concluded, was that that test would not have been helpful in his opinion. I think that's what he concluded regarding the evidence. Well, that's not in the testimony. But that's what I recall that the expert testified to, that that additional test would not have been helpful in this case in his opinion. Just to back up for a moment, as far as the omission of the silencer in this case, the jury also heard that the defendant had 3,600 rounds of .22 caliber bullets in his home at the time. They also heard, and introduced by the defense himself, that he had a menagerie of other weapons in house at the time. So the omission of this silencer, and defense counsel wants to consider it to be such a sinister thing, it's really, the jury was not going to be persuaded by the introduction of this silencer in light of all the other firearms evidence that was introduced in this case, and partially introduced by the defense in this case. As far as the defense attempt to introduce the February 21st interview of the defendant by Commander Christensen, in this case I would like to backtrack because defense counsel doesn't address this in his argument. First of all, when this was introduced during trial, he is submitted that this was an exception to the hearsay rule. There was no discussion of the completeness doctrine before the trial court. So we're here to determine whether or not the trial court abused its discretion, and the trial court never heard any argument regarding the completeness doctrine when defense attempted to introduce this testimony. So then he files a motion for a new trial. He argues, and let me backtrack, what the trial court found was we can get in the defendant's statements because they're admission by a party opponent. The defendant cannot get his own hearsay statements in. Then in the motion for a new trial, defense argues, raises the same issue and alternatively argues that O is also admissible under the completeness doctrine. There's no argument, there's no further case law, there's no support for that at all. There's no presentation of any support for that. Now on direct appeal, he did not raise the completeness doctrine in his opening brief. I raised the issue in my brief in order so that this court could have a thorough presentation of the issues in this case. Now for the first time in his reply brief, he raises the completeness doctrine. So first of all, the defendant has to get over a huge hurdle that there's a forfeiture of this argument in this case. He has not presented or made any representation that he can satisfy a plain error doctrine in this case. And as far as the completeness doctrine, the completeness doctrine was codified under the new Illinois Rules of Evidence on January 1, 2011. Before that, it was the common law doctrine that ruled. So right now, common law doctrine has been trumped by the Illinois Rules of Evidence. That's what we need to follow in this case. Under the Illinois Rules, a party has to have either a writing or a recorded statement. In this case, what you have is we presented an oral statement in this case. But under the Illinois Rules, you are not allowed, a party is not allowed to, under the completeness doctrine, introduce an oral statement. Because I'll read you the rule. When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at any time of any other part of any other writing or recorded statement which ought in fairness to be considered contemporaneously with it. There's no provision in this rule that allows the admission of an oral statement. But there's a recording of the 2004 statement. That's correct. But what we're talking about, there's two statements. The first statement that we introduced is an oral statement. It's only merely a conversation that Commander Christensen had with the defendant. It's only an oral statement at the first time. So both of the statements have to either be a writing or recorded statement. Excuse me. Christensen said that he had notes of those 2003 meetings with the defendant. Yes. But he destroyed the notes. Correct. So it's not the defendant's fault that there's no written statement. I mean, the defendant can't produce a written statement because there isn't one because it got destroyed by the cops. Right. But that's our choice that there's an oral statement out there. And we didn't seek to and we can't introduce a police report. We're not allowed to introduce a police report. And the fairness of the defendant obviously was taken into consideration when this rule was codified because it requires, now there's no committee comments showing why they've excluded oral statements, but the rules specifically provide only for writings and recorded statements. They do not allow for oral statements to be admitted. And in Cragen, the one case that the second district has, looked at this new Illinois rule of evidence, they specifically said under the common law doctrine, oral statements were admissible and now they're no longer admissible. So we believe that even if you were to address this issue under the completeness doctrine, it's not admissible under the completeness doctrine because it's an oral statement. And in conclusion, unless the court has any other questions, people respectfully request the defendant's conviction and sentence in this case be affirmed. Thank you. Thank you. Briefly, I don't, I agree, or don't agree. I believe the coins, there was absolutely no relevance to them and for the reasons I stated, they were very prejudicial. In the event, even if that was allowed, even if that ruling was right, that should have opened the door as I argued. This opens the door, then if you're going to tie these to my guy, let me talk about the victim because he's the burglar, we know that. Crabil isn't, we know that. And the judge said no, no door is opened. The fingerprint, they were lifelong friends. It did not show David Crabil was not tied by that fingerprint. And I would note inside the car there was unknown DNA not tied to Crabil, unknown fingerprints not tied to Crabil. We argued that would be your killer. We don't know that the silencer was used. Counsel said the silencer was used. Their expert said, I think first question on cross, I don't know. Tell me if the silencer was used, I don't know. They have to show more than it could have been used. I'm sure there are several silencers that would have fit the threading to the gun and would they have been admitted? I submit they would not have been. The justification for putting in the silencer, no one called 911. As I sit here, I think to myself, there was no one who took the stand and testified that they were a dispatcher and they didn't get any calls. So the jury didn't hear any evidence that the jury didn't hear any evidence about a call to 911, aside from I believe the person who found the body. But they didn't hear someone who said there were no calls to 911. That wasn't in evidence. And finally, with regard to the Rule 106, I don't believe this argument was made in the brief regarding only applicable to oral statements. If you raised it in your reply for the first time, it couldn't have been, right? Well, the complete You raised the completeness doctrine in your reply. The State didn't have an opportunity to respond. The completeness doctrine was discussed at Trial 1. I don't have a record site for discussion. Is it your position that at the time you were advocating for the admission of the 2004 statement, you argued to the trial court that this is necessary under the completeness doctrine? I did not use the term completeness doctrine, Your Honor. So term completeness was not used. Page 1482, in the conclusion, the motion was made I'm sorry, the State made the motion. Seven points in their motion eliminate. Completeness doctrine was spoken of in relation to other arguments. But when we got to point seven on 2004, term completeness was not stated. The motion was taken under advisement. We pushed for it to be heard. It was finally heard at the last moment before Christensen testified. And this was stated on 1482. Judge, we would like to, among other things, we would like to cross Detective Christensen regarding this conversation that took place in 2004. And the short of it, Judge, is because during the course of this conversation, he recounts with Mr. Craybill several of the statements that he says Mr. Craybill made to him. That was what was said. Completeness term was not used. Finally, with regard to the argument about whether or not Rule 106 applies here because the first statement was oral, I submit that it does because there was a writing, there were the notes. And secondly, the federal counterpart, I believe, has interpreted very similar, if not close to identical language, saying that under these circumstances, the Seventh Circuit has recognized that this rule would apply when there's an oral statement followed by a recorded statement. And I also think the spirit of the law would, the intent of the law would be satisfied if it were applied here, where we do have a recorded statement subsequent to oral, only memorialized by notes. Thank you. Thank you very much. Thank both counsel for your arguments and your briefs. We are going to take the case under advisement. We'd ask, if possible, if you could just stay a few moments and we'll excuse ourselves and answer any questions, not necessarily about this case, but what you do and to the interns that are here. We'd appreciate it. Thank you.